[Cite as *Ottney v. Al Sobb's Auto Truck Frame Serv., Inc.*, 2018-Ohio-4054.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Kyle Ottney

      Appellant

v.

Al Sobb's Auto & Truck Frame
Service, Inc., et al.

      Appellees

Court of Appeals No. L-17-1086

Trial Court No. CVH-16-02211

**<u>DECISION AND JUDGMENT</u>**

Decided:  October 5, 2018

* * * * *

Thomas E. Cafferty, for appellant.

David G. Squillante, for appellees.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Kyle Ottney, appeals from the March 20, 2017 and November 4, 2016 judgments of the Toledo Municipal Court finding in favor of appellees, Al Sobb's Auto & Truck Frame Service, Inc. and Rick Moll, on appellant's complaint and dismissing appellees' counterclaims.  Appellant appeals and asserts the following single

assignment of error relating solely to the dismissal of his claims of a violation of the Ohio Consumer Sales Practices Act, R.C. Chapter 1345 ("OCSPA"):

> The Trial Court's judgment was contrary to the manifest weight of the evidence.

For the reasons which follow, we reverse.

{¶ 2} This case arises out of the sale of a commemorative 25-year anniversary 1978 Corvette with a salvage title. Appellant sued appellee, Rick Moll, individually, and Al Sobb's Auto & Truck Frame for damages ($5,280 plus attorney fees, or $6,930 total) for breach of contract and a violation of the OCSPA. Appellant asserted the unfair or deceptive act was failing to provide a written estimate of the repair work to be performed as required by Ohio Adm.Code 109:4-3-13, failing to complete the work within eight weeks of the promised delivery date without offering a refund or renegotiating the contract as required Ohio Adm.Code 109:4-3-09(A)(2); and failing to provide appellant with a written receipt for deposits as required by Ohio Adm.Code 109:4-3-07(C). Appellee counterclaimed for breach of contract and to recover the cost of storage of $10 a day for 17 months.

{¶ 3} The case proceeded to a bench trial and on November 3, 2016, the trial court entered "judgment for defendant." We dismissed an appeal from this judgment finding it was not a final, appealable order because it did not resolve all of the claims against all of the parties. The trial court entered a nunc pro tunc entry on March 20, 2017, correcting its judgment to indicate that the court intended to dispose of all claims by entering a

2.

judgment for appellee. Again, we dismissed the appeal because the judgment did not dispose of all of the parties. On December 29, 2017, the trial court entered a second nunc pro tunc judgment granting judgment to both appellees and dismissing the counterclaims of both appellees, and we reinstated appellant's appeal.

{¶ 4} In his sole assignment of error, appellant first argues the trial court erred when it found appellees had not violated the OCSPA.

{¶ 5} A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the verdict than not. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn therefrom, but it cannot re-determine the facts. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273 (1984). The court of appeals must also make every reasonable presumption in favor of sustaining the verdict and judgment. *Eastley*, at ¶ 21, quoting *Seasons Coal* at 80, fn. 3.

{¶ 6} The following evidence was admitted at trial. Appellee Moll testified that a customer, Robert Lee, brought the vehicle into appellee's shop in order to get it running and sell it. Appellee was able to start the vehicle and determined the engine was in good condition. He was unable to sell the vehicle for two-to-three months. Lee testified he purchased the car, with 29,007 miles, for $3,000 from "Skeeter" who, for unknown

3.

reasons, gave a rebuilt salvage title. Lee titled the vehicle in his girlfriend's name, Najae Johnson, because his license was suspended. Moll further testified Lee originally wanted $4,000 for the vehicle considering its condition but reduced the price to $2,500 because he needed the money.

{¶ 7} Moll knew appellant's father and learned that appellant was looking for a Corvette. Appellant's father took some pictures and sent them to appellant who lived out of town. The father did not testify at trial. Appellant testified he drove the vehicle before purchasing it. Appellant testified the parties orally agreed to a purchase price of $500. The Certificate of Title listed $500 as the purchase price. However, Lee testified he told appellant to show a sale for $500 on the title to lower the taxes Lee would pay in New York. Appellant wanted to have a friend repaint the vehicle, but he finally agreed to let someone in appellee's shop do the work for $3,760.

{¶ 8} Appellant testified he believed he was getting a good deal but he knew appellee was desperate for money to pay a debt. Also, appellant testified the value of the car was not as high as appellee testified because it is a salvaged car, not in original condition, and therefore, not a collector car. He also testified it was a generic 1978 Corvette, one of the highest production cars made in 1978 and an L82, the slowest model produced that year.

{¶ 9} It is undisputed that on August 26, 2014, appellant transferred $2,060 to appellee (which appellant testified covered $500 for the car and $1,560 to cover the cost of the paint and materials). He transferred an additional $200 on September 18, 2014,

4.

because he did not believe appellee had enough money to buy the paint. On September 30, 2014, appellant transferred $1,000 and on May 15, 2015, made a final payment of $1,000, for a total of $4,260.

{¶ 10} Appellant visited appellee's shop in early 2015, after the first couple of payments had been sent to Moll, to check on the progress of the painting job and took pictures which were admitted into evidence. He saw parts were missing from the vehicle and some of the paint had been stripped. Appellant testified he was concerned about sending the final payment to appellee because there was little progress being made despite discussions between appellant's father and appellee. However, appellant finally paid the full amount in May 2015, believing appellee would finish the car.

{¶ 11} Appellant testified he called appellee frequently to check on the repairs and appellee would say the vehicle would be finished in a month and later that the vehicle was being shipped to another dealership to be painted at a special body shop. Appellant continued to call appellee until appellee began ignoring appellant's phone calls. Appellant presented phone records from AT&T showing his numerous calls to appellee's shop from October 2 to November 1, 2015, with no incoming phone calls from appellee.

{¶ 12} Appellant testified he had to eventually file an action on February 11, 2016, and sought the injunctive relief of replevin. Appellee returned the vehicle five days later. After the vehicle was returned, appellant found it was in worse condition than when he purchased it. He testified the vehicle looked the same as it had in his photographs taken earlier in 2015. Furthermore, the taillights, other miscellaneous trim, gas caps, and stereo

5.

were not returned to him and the vehicle no longer starts.  Appellant obtained estimates of the cost to paint the car in full and put the car back together.  Appellant determined the cost to replace the missing taillights alone is approximately $2,700 based on the basic stock parts available on a Corvette website.  Appellant also presented evidence of his attorney fees of $930 for 11 hours of work.

{¶ 13} Moll testified that when appellant's attorney contacted Moll, he denied the car had been sold for $500.  At trial, he testified appellant still owed Moll $740 because they had agreed appellant would pay $2,500 for the car and one of Moll's employees would strip and paint the car for $2,500 within a reasonable time but under Moll's control of the timing to complete the job.  He further testified the car was worth $2,500 because the parts alone were worth thousands of dollars.  Lee testified Moll gave him $2,500 cash when the car was sold.

{¶ 14} Appellee testified the only documentation he had was a "Repair Order" because he considered this a sale between friends.  The "Repair Order" admitted into evidence identified the "Job Order" as a "78 Corvette" and under the "Description or Work" section listed "strip and paint $2,500."  The order did not identify the customer or include any signatures.  Appellant denied ever having received this document.  Appellees counterclaimed for storage charges of $10 a day from August 6, 2014, until December 2015, after appellant's replevin action was granted and appellant regained possession of the car.  Appellee denied that any parts were missing when the car was returned.  He testified parts which were removed in the process of stripping the car were placed inside

6.

the car. He also testified appellant already received the benefit of his bargain because the 120 hours of stripping already completed was worth at least $1,800-$2,000.

{¶ 15} In connection with such a consumer transaction, the OCSPA prohibits unfair or deceptive acts, R.C. 1345.02(A), or unconscionable acts or practices, R.C. 1345.03(A). R.C. 1345.02(A) provides:

> (A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

And, R.C. 1345.03(A) provides:

> (A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

It is undisputed that appellees are "engaged in the business of effecting or soliciting consumer transactions," R.C. 1345.01(C), and this transaction was a consumer transaction, as defined by R.C. 1345.01(A), because it involved the offering of a service to an individual for personal purposes by a seller engaged in the business of effecting or soliciting consumer transactions.

7.

**{¶ 16}** R.C. Chapter 1345 further sets forth examples of what are deceptive acts or practices, R.C. 1345.02(B) and 1345.03(B). R.C. 1345.05(B)(2) gives the Ohio Attorney General the power to adopt substantive rules that further define unfair and deceptive acts.

**{¶ 17}** Regarding motor vehicle repairs or services, Ohio Adm.Code 109:4-3-13(A)(1) provides that:

(A) It shall be a deceptive act or practice in connection with a consumer transaction involving the performance of either repairs or any service upon a motor vehicle where the anticipated cost exceeds fifty dollars and there has been face to face contact at the supplier's place of business during the hours such repairs or services are offered, between the consumer or his representative and the supplier or his representative, prior to the commencement of the repair or service for a supplier to:

(1) Fail, at the time of the initial face to face contact and prior to the commencement of any repair or service, to provide the consumer with a form which indicates the date, the identity of the supplier, the consumer's name and telephone number, the reasonably anticipated completion date and, if requested by the consumer, the anticipated cost of the repair or service. The form shall also clearly and conspicuously contain the following disclosures in substantially the following language:

8.

"You have the right to an estimate if the expected cost of repairs or services will be more than fifty dollars. Initial your choice:

___ written estimate

___ oral estimate

___ no estimate"

Furthermore, it is a deceptive act or practice to "[f]ail, at the time of the signing or initialing of any document by a consumer, to provide the consumer with a copy of the document." *Id*. at (C)(15).

{¶ 18} While appellees assert the "Repair Order" admitted into evidence was given to appellant, he denied receiving it. Because of the lower court's sparse judgment, we do not know the basis for the court's ruling. However, even if the lower court found Moll more credible, the "Repair Order" does not contain the disclosure language required by this rule. The form did not contain appellant's name, did not contain a "date, * * * the consumer's name and telephone number, the reasonably anticipated completion date and, if requested by the consumer, the anticipated cost of the repair or service." Furthermore, the order did not "clearly and conspicuously contain a disclosure of the consumer's right to a written estimate."

{¶ 19} Appellees next argue there was no violation of the rule because there had been no face-to-face contact between appellant and appellees. We reject this argument because the rule specifically permits the face-to-face contact to be "between the consumer or his representative and the supplier." Appellant testified he was present

9.

before he purchased the vehicle and drove it. Alternatively, even if there had been no face-to-face meeting between appellant and appellee, appellant's father was clearly representing appellant's interest in negotiating the repair work with appellee. Finally, Ohio Adm.Code 109:4-3-13(B)(1) describes a corresponding duty where there has not been a face-to-face contact between the consumer and the supplier.

{¶ 20} Appellees also argue the "Repair Order" admitted into evidence was a quoted repair cost rather than an estimate, as allowed pursuant to Ohio Adm.Code 109:4-3-13(F). That section provides:

> (F) In lieu of complying with the requirements of paragraphs (A)(1) and (B)(1) to (B)(4) of this rule, a supplier may provide a consumer, prior to the commencement of any repair or service, with a written quotation of the price at which the repair or service will be performed, which shall indicate that the quotation shall be binding upon the supplier for a period of five days, provided that the subject of the consumer transaction is made available to the supplier for the repair or service within that period.

{¶ 21} In the case before us the "Repair Order" could have been either an estimate or a quote because it lacked the required language which could distinguish it as one or the other. Even if appellees' "Repair Order" is a substitute quoted repair cost permitted by Ohio Adm.Code 109:4-3-13(F), the evidence is undisputed that the quotation did not comply with the rule because it did not "indicate that the quotation shall be binding upon

10.

the supplier for a period of five days" and also did not contain the identifying information implicitly required as a substitute for an estimate.

{¶ 22} While appellees assert that they substantially complied with the regulations, substantial compliance is irrelevant when the supplier is required by a regulation to specifically perform certain actions to avoid committing an unfair and deceptive act. When the Ohio Attorney General promulgated Ohio Adm.Code 109:4-3-13, it stated that "(A) It *shall* be a deceptive act or practice * * * for a supplier to * * * (1) [f]ail * * * to provide the consumer with * * * the anticipated cost of the repair or service," or provide for an alternative repair order which "(F) * * *shall* indicate that the quotation shall be binding upon the supplier for a period of five days." (Emphasis added). While exceptions have been made for overlooking technical violations, *Simmons v. Cadillac*, 8th Dist. Cuyahoga No. 43011, 1981 Ohio App. LEXIS 10974, *7-8 (Apr. 2, 1981), and a bona fide error limits liability to actual damages, *Zindle v. Hawks Appliance Serv., Inc.*, 9th Dist. Summit No. 13016, 1987 Ohio App. LEXIS 8631, *12 (Sept. 2, 1987), no court has applied a substantial compliance standard. The clear language of the statute provides that "any failure to comply with the regulations is deemed a 'deceptive act or practice.'" *Erie Shore Builders v. Leimbach*, 6th Dist. Huron No. H-99-034, 2001 Ohio App. LEXIS 3158, *7, 10 (July 13, 2001); *Zindle* at 6-7, 10; *Steger v. Superior Dodge, Inc.*, 2d Dist. Montgomery No. CA 9165, 1985 Ohio App. LEXIS 8826, at *9 (Oct. 11, 1985); *Moyer Excavating & Trucking v. Lewis*, 6th Dist. Huron No. H-84-11, 1984 Ohio App. LEXIS 11529, *8 (Nov. 16, 1984).

11.

**{¶ 23}** There are several cases which have dismissed a consumer's action on the ground that the consumer did not suffer any actual damage. *Crull v. Maple Park Body Shop*, 36 Ohio App.3d 153, 157, 521 N.E.2d 1099 (12th Dist.1987) (the majority of the court found that an estimate which stated, "[t]his estimate is for immediate acceptance," although contrary to the requirement of Ohio Adm.Code 109:4-3-13(F) by failing to indicate the quoted price was binding for five days, was not a deceptive act or practice since the supplier charged the quoted price and treated the quote as binding for several months); *Cicero v. Am. Satellite, Inc.,* 10th Dist. Franklin No. 10AP-638, 2011-Ohio-4918, ¶ 19 (summary judgment granted to the supplier where the consumer had not been actually deceived by the violation of a specific OCSPA rule). However, a requirement of actual damages is contrary to the explicit language of R.C. 1345.09(B), which allows the consumer to collect $200 in statutory damages. *Sterling Constr., Inc. v. Alkire*, 12th Dist. Madison No. CA2016-12-032, 2017-Ohio-7213, ¶ 13; *Williams v. Kia of Bedford*, 8th Dist. Cuyahoga No. 105616, 2018-Ohio-283, ¶ 26-28 (the majority view is that plaintiffs may recover for each individual violation of the OCSPA "if there are separate rule violations caused by separate acts." (*Citations omitted*); *Crye v. Smolak*, 110 Ohio App.3d 504, 512, 674 N.E.2d 779 (10th Dist.1996).

**{¶ 24}** Therefore, we find the trial court's finding that appellees had not violated either of these regulations is contrary to the manifest weight of the evidence.

12.

{¶ 25} Appellant also argues the trial court's finding that appellees did not violate Ohio Adm.Code 109:4-3-09 by failing to complete the work within eight weeks or offer to refund was contrary to the manifest weight of the evidence.

{¶ 26} Ohio Adm.Code 109:4-3-09(A)(2) provides that it is a

(A) It shall be a deceptive act or practice in connection with a consumer transaction for a supplier:

* * *

(2) To accept money from a consumer for goods or services ordered by mail, telephone, or otherwise and then permit eight weeks to elapse without:

(a) Making shipment or delivery of the goods or services ordered;

(b) Making a full refund;

(c) Advising the consumer of the duration of an extended delay and offering to send the consumer a refund within two weeks if the consumer so requests; or

(d) Furnishing similar goods or services of equal or greater value as a good faith substitute if the consumer agrees.

{¶ 27} In this case, it is undisputed that appellees contracted to strip and repaint the vehicle but never completed the work during the nearly one and one-half years they had possession of the vehicle and released the vehicle to appellant only after he sought an order of replevin. Appellant testified he paid for the restoration work in full and was

13.

continually told the work would be done in a month and until Moll began to ignore appellant's calls. While appellee testified that appellant did not pay the repair bill in full, there was no evidence presented that he informed appellant the delay in completing the car was due to the lack of payment. It was not until appellant's attorney spoke to Moll that he claimed the cost of the car exceeded $500 and appellant owed $760 on the repair bill. There was no evidence presented that appellees notified appellant he had not paid the bill in full.

{¶ 28} Even if we found the time requirement of the regulation was amended by an oral agreement between the parties to allow the work to be completed in a "reasonable time," we find the manifest weight of the evidence supports a finding that appellees failed to comply with Ohio Adm.Code 109:4-3-09(A)(2). It is without question that appellees did not complete the repair "within a reasonable time" when appellant had to resort to filing a replevin action to regain possession of his vehicle, the work was not completed after 17 months, and appellant was never notified the repairs had not been completed because the bill had not been paid in full. Therefore, the trial court's finding that there was no violation is contrary to the manifest weight of the evidence.

{¶ 29} Finally, appellant alleges that appellees violated Ohio Adm.Code 109:4-3-07(C) by failing to provide appellant with a written receipt for deposits. Ohio Adm.Code 109:4-3-07 provides, in pertinent part:

14.

It shall be a deceptive act or practice in connection with a consumer transaction for a supplier to accept a deposit unless the following conditions are met:

* * *

(B) At the time of the initial deposit the supplier must provide to the consumer a dated written receipt stating clearly and conspicuously the following information:

(1) Description of the goods and/or services to which the deposit applies, (including model, model year, when appropriate, make, and color);

(2) The cash selling price and the amount of the deposit; "Cash selling price", for purpose of this rule, as it relates to motor vehicle transactions, includes all discounts, rebates and incentives;

(3) Allowance on the goods to be traded in or other discount, if any;

(4) Time during which any option given is binding;

(5) Whether the deposit is refundable and under what conditions, provided that no limitation on refunds in a layaway arrangement may be made except as provided by sections 1317.21 to 1317.23 of the Revised Code; and

(6) Any additional costs such as storage, assembly or delivery charges.

15.

(C) A written receipt stating the date and amount paid shall be provided to the consumer for each and every subsequent deposit made, which receipt shall also state the remaining amount due. A deposit made where the terms set forth in division (B) of this rule are altered or modified by agreement of the supplier and consumer shall not be considered as a subsequent deposit, but rather as an initial deposit.

(D) For the purposes of this rule "deposit" means any amount of money tendered or obligation to pay money incurred by a consumer for a refundable or non-refundable option, or as partial payment for goods or services.

{¶ 30} There was no evidence presented by appellees that they provided the deposit receipt required by the regulation or that the exception to the rule applied. Therefore, the trial court's failure to find that appellees did not comply with the regulation is contrary to the manifest weight of the evidence.

{¶ 31} Each regulation discussed above states that a violation of the regulation is a deceptive act or practice. Therefore, we find the trial court's judgment in favor of appellees on appellant's claim of a violation of the OCSPA is contrary to the manifest weight of the evidence and the trial court erred in dismissing this count of appellant's complaint. Appellant's sole assignment of error is found well-taken.

{¶ 32} Having found that the trial court did commit error prejudicial to appellant and that substantial justice has not been done, the judgment of the Toledo Municipal

16.

Court is reversed. Pursuant to App.R. 12(C), we hereby enter the judgment the lower court should have entered, which is judgment for appellant on Count 1 of his complaint. However, because the calculation of the damages requires consideration of the disputed factual evidence and the trial court never made any factual findings upon which we can determine the damage award, this case is remanded to the lower court for further proceedings to determine the damage award. Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

_____
JUDGE

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE